UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LOUANGEL, INC.; dba LONGHORN STEAKHOUSE RESTAURANT, *et al*, | § § § § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:12-CV-00147 |
| DARDEN RESTAURANTS, INC., *et al*, | § § § § | |
| Defendants. | § | |

## ORDER ON MOTION FOR
## PARTIAL SUMMARY JUDGMENT ON TACKING

Before the Court is Plaintiffs' Motion for Partial Summary Judgment on Tacking (D.E. 93), along with the Defendants' Response (D.E. 106) and Plaintiffs' Reply (D.E. 124). Plaintiffs seek a partial summary judgment that Defendants are not entitled to tack[1] their 1995 (and subsequent) trademark claims onto their 1981 trademark[2] in order to determine priority of use. For the reasons set out below, the Motion is GRANTED.

### FACTS

In 1981, Defendants operated restaurants named "Long Horn Steaks" in states in the Eastern part of the country. Defendants registered what will be referred to as the "Bongo" style trademark for its steak restaurant, using the name Long Horn Steaks as

---

[1] Defendants suggest that the issue of tacking is a defense to an abandonment claim and should not have been raised in a motion separate from abandonment. D.E. 106, p. 4. The Court finds that the issue of tacking has been addressed independently from any other issue in countless cases and finds nothing procedurally infirm in Plaintiffs' motion.

[2] Defendants acquired the rights to, and registered, the word mark "Longhorn," claiming a first use date of 1970. The Plaintiffs have not made that word mark a subject of their motion.

three separate, stacked words in a bold, chunky font and substituting Bongo,[3] a baby-faced cartoon cow's head with vertical horns, as the "o" in "Long" and a cartoon t-bone steak as the "t" in "Steaks," followed in 1992 by a similar horizontal version of the trademark:

  

This trademark will be referred to as the "Bongo" trademark. In 1995, wanting a more "upscale" image and with major expansion plans, Defendants broadened their menu and registered a new trademark using a minimalist or more abstract rendering of the outline of a cow's head with horizontal horns, and with "LongHorn" as one word over "steakhouse" in a sleeker font:

  

This trademark will be referred to as the "Minimalist" trademark.

In between the Defendants' Bongo and Minimalist trademark registrations, Plaintiff began the use of its own logos in 1989, for its "Longhorn Restaurant" with a cow's head rendering as a prominent design feature. The cow's head design has

---

[3] The cartoon cow was named Bongo after a contest. D.E. 124-3, p. 5.

horizontal horns and is somewhat more detailed than Defendants' Minimalist logo, but not as cartoonish as the Defendants' Bongo logo:



Plaintiffs operated their restaurants exclusively in the Corpus Christi, Texas area.

This lawsuit was precipitated by Defendants' plans to expand into the Corpus Christi market, with local advertising and the sale of Defendants' LongHorn Steakhouse gift cards at Corpus Christi retail stores. Both Plaintiffs and Defendants have alleged trademark infringement claims against each other. Plaintiffs seek partial summary judgment that Defendants are not entitled to "tack" their 1981 Bongo trademark onto the Minimalist trademark, thereby rendering Plaintiffs' trademark prior in time.

## DISCUSSION

### A. In the Fifth Circuit, it Appears that Whether a Trademark Can Be Tacked is a Question of Fact.

The first issue presented is whether the determination of a trademark's "tacking" is a question of law as argued by Plaintiffs or a question of fact as argued by Defendants. It is no secret that there is a circuit split on the issue. The Federal Circuit and the Sixth Circuit treat tacking as a question of law. *Van Dyne–Crotty, Inc. v. Wear–Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991); *Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 623 (6th Cir. 1998). The Ninth Circuit treats it as a question of fact. *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 759 (9th Cir. 2006).

The courts' treatment of the tacking question is commensurate with their treatment of the related issue of "likelihood of confusion" in the trademark context. *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 759 (9th Cir. 2006); *Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 583 (N.D. Ill. 2010).

> Because the tacking analysis is an outgrowth of the *DuPont* similarity of marks factor, one must look to the relevant circuit's likelihood of confusion case law for guidance on the fact-versus-law question. If likelihood of confusion raises a question of law, as it does in the Federal Circuit, the tacking analysis also poses a question of law. Consequently, in these jurisdictions, summary judgment on the tacking issue may be determined by a comparison of the trademark specimens in the record without more. This comparison, based on the "visual or aural appearance of the marks," is in essence an "eyeball" test, the application of which can best be understood by reviewing the Morton Salt Girl trademark. . . . Judges would do well to follow the Morton Salt Girl example for tacking as a matter of law.
>
> If likelihood of confusion raises a question of fact, as it does in the Ninth and Seventh Circuits, however, tacking raises a question of fact. A party in these jurisdictions seeking to tack its marks should submit evidence of consumer perceptions regarding the commercial impression of the marks sought to be tacked. The court should not merely speculate on how consumers would perceive the marks. Even in these circuits, however, the tacking question may be resolved as a matter of law if the evidence points to only one possible conclusion.

GILSON ON TRADEMARKS, § 3.03[g][i] (Matthew Bender & Co. 2012) (footnotes omitted). The Fifth Circuit, while not having addressed the treatment of the tacking question, treats "likelihood of confusion" as a question of fact. *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985) (*per curiam*). Therefore, this

Court is constrained under the common analysis of the issue to treat the tacking question as one of fact.

### B. The Test for Tacking is Strict.

Whether it is considered a question of law or fact, the test for tacking appears to be universally recited as:

> The previously used mark must be the ***legal equivalent*** of the mark in question or ***indistinguishable*** therefrom, and the consumer should consider both as the same mark. However, for the purposes of "tacking," even if the two marks are confusingly similar, they still may not be ***legal equivalents***. Instead, the marks must create "the ***same, continuing commercial impression***," and the later mark should not materially differ from or alter the character of the mark attempted to be "tacked."

*Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991) (citations omitted; emphasis added; treating it as a legal question). *See also Quiksilver, supra* at 758 (treating it as a fact question); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1047-48 (9th Cir. 1999).

The tacking doctrine, viewed as a constructive use theory, applies to a "similar, but technically distinct, mark." *Adventis, Inc. v. Consolidated Property Holdings, Inc.*, No. 7:02CV00611, 2006 WL 1134129, *3 (W.D. Va. April 24, 2006) (citing *Brookfield, supra*). "The application of this test is strict, with the Federal Circuit stating that tacking is only 'occasionally permitted' in the 'rare instances' where the old and new formats are 'legal equivalents.'" *Colonial Electric & Plumbing Supply of Hammonton, LLC v. Colonial Electric Supply, Ltd.*, No. 05-5408NLH, 2007 WL 4571105 (D.N.J. Dec. 27, 2007) (citing *Van Dyne-Crotty, supra*).

The circumstances under which a mark may rise to the level of "legal equivalence" so as to be tacked to another is described as "exceptionally narrow." *Id*. at *4; *Data Concepts, supra* at 623. The standard is "exceedingly strict" and "considerably higher than the standard for 'likelihood of confusion.' " *Amicus Communications, L.P. v. Hewlett-Packard Co.*, No. SA-98-CA1176PM, 2000 WL 33348186 (W.D. Tex. Jan. 10, 2000) (citing *Brookfield, supra*); *The Wet Seal, Inc. v. FD Management*, 82 U.S.P.Q.2d 1629, 2007 WL 458529 (T.T.A.B. April 12, 2006).

The test appears to be derived from the Trademark Rules regarding whether a change in a registered mark is permissible, such as when it undergoes minor modernizations. 15 U.S.C. § 1057(e); 37 C.F.R. §§ 2.72, 2.73. "A material alteration exists if the old and new formats do not create the same general commercial impression." *Paris Glove of Canada Ltd. v. SBC/Sporto Corp.*, 84 U.S.P.Q.2d 1856, 2007 WL 2422997 (T.T.A.B. August 22, 2007). Overall, the marks must be quite similar and convey the same impression to the consumer. *Adventis, supra* at *4. Again, this test is more stringent than "confusingly similar." *Data Concepts, supra* at 623.

The marks must be "virtually identical." *One Industries, LLC v. Jim O'Neal Distributing, Inc.*, 578 F.3d 1154, 1161 (9th Cir. 2009). In sum, focusing on the marks in their entirety, "Tacking is occasionally permitted where the two marks, though differing slightly in their literal meaning or grammatical presentation, nevertheless possess the same connotation in context." *Van Dyne-Crotty, supra* at 1160.

C. The Evidence Offered Leads to Only One Possible Conclusion.

Although the Ninth Circuit treats tacking as a question of fact, requiring a "highly fact-sensitive inquiry," it does not hesitate to allow the question to be adjudicated in summary judgment procedure after full discovery. *One Industries*, *supra* at 1160. That court noted that a "question of fact may be resolved as a matter of law if reasonable minds cannot differ and the evidence permits only one conclusion." *Id*. *See generally*, *Isquith v. Middle South Utilities, Inc*., 847 F.2d 186, 208 (5th Cir. 1988). In order to determine whether reasonable minds could differ on the fact question of whether the Minimalist trademark is virtually identical to the Bongo trademark, cases provide a number of relevant perspectives.

First, "[E]quivalence may be based on the visual or aural appearance of the marks themselves." *Children's Legal Services PLLC v. Kresch*, No. 07-10255, 2008 WL 1901245 (E.D. Mich. April 25, 2008) (quoting *Data Concepts, Inc. v. Digital Consulting, Inc*., 150 F.3d 620, 623 (6th Cir. 1998). In this respect, Defendants argue that "Long Horn Steaks" is not much different in aural impression from "LongHorn Steakhouse." While that is true, the same cannot be said of the visual design features accompanying the words. There are obvious and striking differences between the graphics of the two trademarks.

Second, an "eyeball" comparison, alone, does not end the inquiry as "the similarity of marks depends on evidence about the perceptions of consumers in the relevant market—considerations which an aural and visual comparison does not necessarily reveal to the full extent necessary." *Navistar Internat'l Transportation Corp.*

*v. Freightliner Corp.*, No. 96 C 6922, 1998 WL 786388, *6 (N.D. Ill. Nov. 6, 1998). Consumer surveys are frequently used in trademark litigation. *Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F.Supp. 1108, 1116 (S.D.N.Y. 1981). However, no consumer studies or market analyses have been provided to the Court to support a conclusion that the marks do or do not supply the same consumer impression.

Plaintiffs do supply the Defendants' own corporate representative testimony, which explains a concerted effort in 1994-95 to remodel the restaurants to eliminate the Bongo or roadhouse styling and adopt a more upscale image. They removed neon signs and taxidermy, with the exception of a steer head over the bar. D.E. 93-3, pp. 3-5. They changed red vinyl tablecloths and red cloth in the booths to tan or earth-tone fabrics. *Id*., pp. 3-6. Instead of neon lighting, they changed to warmer, golden-toned lighting. *Id*., p. 4. They changed the exterior signage from the Bongo trademark to the Minimalist trademark. *Id*., p. 6. Specifically, Shelly Welch testified that the effort was to "evolve the brand," modernize it, and rethink market strategy to create broader appeal. D.E. 93-3, p. 3.

This was confirmed by George McKerrow, Jr. They "reimaged" "lots of things," including uniforms, china, décor, food offerings, size of the buildings as well as the logo. D.E. 93-4, p. 3. It was an "evolution of the brand to make it and keep it competitive" and to avoid confusion with the earlier iteration of the restaurant. *Id*. They performed a chain-wide renovation changing the dark rustic paneled interior to a brightly lit beige interior. *Id*., p. 4. Racy posters in the restrooms were removed with the idea of appealing to customers "from high chairs to wheelchairs." *Id*., pp. 3-4. More specifically, "The

process was considered to be bringing the brand more upscale and more universally acceptable." *Id.*

This is compelling evidence that Defendants intentionally undertook to change the commercial impression of their trademark. They changed the appearance of the restaurants, the menu, and the attitude to appeal to a broader spectrum of consumers. Those changes were not consistent with the continued use of the Bongo trademark and that trademark disappeared from the exterior of the restaurants and from most of the interiors.

Third—an issue related to the Defendants' overhaul of their operation—is that the commercial impression should be continuous and used for the same or substantially similar goods. *Amicus, supra* at *15. Changing the breadth of goods or services provided under the trademark prevents tacking. *American Paging, Inc. v. American Mobilphone, Inc.*, No. 16,232, 13 U.S.P.Q.2d 2036, 1989 WL 274416 (T.T.A.B. Feb. 16, 1989) (finding phone services different from paging services), *aff'd*, 923 F.2d 869, *1 (Fed. Cir. 1990). *See also Ilco Corp. v. Ideal Security Hardware Corp.*, 527 F.2d 1221 (C.C.P.A. 1976) (finding the impression of "home protection hardware" to be dissimilar to the larger scope of a "home protection center"); *Specht v. Google, supra* at 584; *Schultz v. Artisan Entertainment Inc.*, 2001 WL 304050 (T.T.A.B. March 28, 2001) (not cited as precedent).

In this regard, it would be contrary to trademark principles to tack an earlier mark with a narrow commercial impression onto one with a broader commercial impression. *Brookfield, supra* (citing *Van Dyne-Crotty, supra*). Yet that is what Defendants are

expressly attempting to do. They have broadened their menu and want to have broader appeal, yet seek to tack a narrow trademark onto their more expansive rendition. The law does not support tacking under such circumstances.

Fourth, Defendants characterize these changes as mere modernizations and not a change of commercial impression. "Modernization of a mark or changes in styling generally do not change the commercial impression of the mark." *Miyano Machinery USA, Inc. v. Miyanohitec Machinery, Inc.*, 579 F. Supp. 2d 868 (N.D. Ill. 2008). This is especially true of word marks, which are seldom reliant on font, size, and other elements of form. *Paris Glove, supra* at 1861-62. However, when dealing with a composite mark involving an integrated design element, a change to that design element may well alter the commercial impression. *Id*. *See also Pro-Cuts v. Schilz-Price Enterprises, Inc.*, 27 U.S.P.Q.2d 1224, 1993 WL 266611 (T.T.A.B. May 11, 1993).

The quintessential examples of successful modernizations that maintain the original trademark are the Morton Salt Girl and the Green Giant. *See generally*, GILSON ON TRADEMARKS, § 3.03[g][i]. Those modernizations still maintain all of the familiar elements of the figures. *See e.g.*, http://www.mortonsalt.com/our-history/history-of-the-umbrella-girl. In Defendants' trademark change, a smiling cartoon cow is replaced by an abstract outline that shares none of Bongo's familiar elements. Facial features are gone, horns go from short verticals to long horizontals, and the placement vis-à-vis the words is completely different.

Defendants argue that realistic and stylized images may both be used in maintaining a trademark's identity, citing *Dreyfus*. However, the *Dreyfus* court was not

presented with a tacking issue and only briefly referenced trademark abandonment. The issue in that case was "likelihood of confusion," a substantially lesser standard than is applied in tacking. Furthermore, the realistic and stylized lion in that case were explained to be quite similar:

> Since 1974, Dreyfus has used a drawing of a stylized lion in connection with all of its funds, but that drawing is itself based directly upon a picture of the same lion used in the TV ads, PX 2-10, designed because the picture could not successfully be used and printed in the relatively small format currently used to promote Dreyfus.

*Dreyfus, supra* at 1115. Defendants' trademarks are not so similar. Other than both suggesting a cow's head, it is hard to imagine a more different set of renderings.

Fifth, separate registration of the marks is some evidence that the owner does not regard them as a continuum or mere modification or modernization. *One Industries, supra* at 1159. Here, Defendants registered all of their marks independently, with first use dates of 1995 or later, without any claim to modification of the Bongo trademark. *E.g.*, D.E. 107-9; 107-10; 107-16; 107-17; 107-18.

Defendants offer the opinions of Robert Cissel, a trademark legal expert, and David Stewart, a Professor of Marketing and Law. D.E. 106-2, 106-3. Despite their impressive credentials, these retained witnesses offer nothing more than their own subjective conclusions based upon their view of the trademarks themselves and not upon anything but the most abstract principles of consumer conduct. They cannot attest to any actual consumer response to the Defendants' particular change in trademarks.

Defendants also argue that the dominant portion of the Bongo trademark is the word "Longhorn." With that argument, they seek the treatment of their Bongo trademark as a word mark that is identical to the Minimalist trademark in that it, too, uses the term "Longhorn." This argument is contrary to the Defendants' registration of the Bongo trademark as a design plus words trademark rather than as a word mark alone. D.E. 107-2. Furthermore, at the time that both Plaintiffs and Defendants began using "Longhorn" in connection with their restaurants, the "Longhorn" word mark was owned by a third party. D.E. 106, p. 9.

As discussed above, there can be no question that Bongo and the other design elements of the Bongo trademark make it distinctive. "[A] change which does not alter [the mark's] distinctive characteristics represents a continuity of trademark rights." *Humble Oil & Refining Co. v. Sekisui Chemical Co.*, 165 U.S. P. Q. 597, 1970 WL 9925 (T.T.A.B. March 30, 1970). Conversely, a change that does alter the distinctive characteristics breaks that continuity. Defendants' arguments in this regard are contrary to the appearance of their trademarks, contrary to the law, contrary to their witnesses' testimony, and, as pointed out by Plaintiffs, contrary to Defendants' own legal arguments when the opposite position suited their needs. *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 361-63 (11th Cir. 1997).

Considering the legal principles and the evidence offered by the parties, the Court is of the opinion that reasonable minds would not differ on the question of whether the Bongo trademark can be tacked onto the Defendants' Minimalist trademark. In 1994 and 1995, Defendants sought to create a new, better, and broader commercial impression and

succeeded in doing so. In that process, it risked the loss of priority that the Bongo trademark offered—a gamble well understood by those familiar with trademarks. While Defendants had an opportunity to offer evidence to raise a fact question for the jury, their evidence was not sufficient to breach the "exceedingly strict" requirements of tacking trademarks.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Motion for Partial Summary Judgment on Tacking (D.E. 93) and holds that Defendants are not entitled to tack the priority date of the 1981 Bongo trademark onto their later Minimalist trademark.

ORDERED this 22nd day of March, 2013.

*[signature]*
NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE